UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

No. 09-3142-AMS

UNITED STATES OF AMERICA

vs.

JERRY A. SPIEGEL,

       Defendant.
_____/

## CRIMINAL COVER SHEET

1. Did this matter originate from a matter pending in the Northern Region of the United States Attorney's Office prior to October 14, 2003?  _____ Yes  __X__ No

2. Did this matter originate from a matter pending in the Central Region of the United States Attorney's Office prior to September 1, 2007?  _____ Yes  __X__ No

                              Respectfully submitted,

                              JEFFREY H. SLOMAN
                              ACTING UNITED STATES ATTORNEY

BY: _____
                              O. BENTON CURTIS III
                              ASSISTANT UNITED STATES ATTORNEY
                              District Court No. A5501022
                              99 N. E. 4th Street
                              Miami, Florida  33132-2111
                              TEL (305) 961-9151
                              FAX (305) 530-6168
                              Benton.Curtis@usdoj.gov

# United States District Court

**SOUTHERN** DISTRICT OF **FLORIDA**

UNITED STATES OF AMERICA

v.

JERRY A. SPIEGEL,

Defendant.

## CRIMINAL COMPLAINT

CASE NUMBER: 09-3142-AMS

I, the undersigned complainant, being duly sworn, state the following is true and correct to the best of my knowledge and belief. From on or about June 17, 2008, and continuing through on or about December 31, 2008, in Miami-Dade County, in the Southern District of Florida, and elsewhere, the defendant, JERRY A. SPIEGEL, did knowingly and willfully combine, conspire, confederate and agree with others to violate Title 18, United States Code, Section 1347, that is, to execute a scheme and artifice to defraud a health care benefit program affecting commerce, as defined in Title 18, United States Code, Section 24(b), that is, Medicare, and to obtain, by means of materially false and fraudulent pretenses, representations, and promises, money and property owned by, and under the custody and control of, said health care benefit program, in connection with the delivery of and payment for any health care benefits, items, and services; in violation of Title 18, United States Code, Section 1349.

I further state that I am a Special Agent with the Federal Bureau of Investigation, and that this complaint is based on the following facts:

### SEE ATTACHED AFFIDAVIT

SCOTT HOUSER, SPECIAL AGENT
FEDERAL BUREAU OF INVESTIGATION

Sworn to before me, and subscribed in my presence,

August 21, 2009
Date

at Miami, Florida
City and State

Signature of Judicial Officer

ANDREA M. SIMONTON
UNITED STATES MAGISTRATE JUDGE

## AFFIDAVIT

Your Affiant, Scott Houser, first being duly sworn, states as follows:

1. I am an investigative and law enforcement officer of the United States empowered by law to conduct investigations of, and make arrests for, offenses enumerated in Title 18 of the United States Code.

2. I am a Special Agent with the Federal Bureau of Investigation and have been employed in such capacity for approximately three (3) years. I currently am assigned to the Miami Field Division, where I investigate violations of federal law, specifically health care fraud violations. I have participated in numerous health care fraud investigations and have received extensive training in investigating financial crimes.

3. This affidavit is written in support of a criminal complaint charging Jerry A. Spiegel ("SPIEGEL"), date of birth June 8, 1932, Social Security Number 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, with conspiracy to commit health care fraud, in violation of Title 18, United States Code, Section 1349.

4. I make this affidavit based on my own personal knowledge, as well as information provided to me by other law enforcement officers and civilians. Because this affidavit is submitted for the limited purpose of establishing probable cause for a criminal complaint, it does not contain all the facts known to me relating to this investigation. However, no information known to me that would tend to negate probable cause has been withheld from this affidavit.

### **The Medicare Program**

5. The Medicare Program ("Medicare") was a federal program that provided free or below-cost health care benefits to certain individuals, primarily the elderly, blind, and disabled. The

1

benefits available under Medicare are prescribed by statute and by federal regulations under the auspices of the Department of Health and Human Services ("HHS"), through its agency, the Centers for Medicare and Medicaid Services ("CMS"). Individuals who received benefits under Medicare were commonly referred to as Medicare "beneficiaries."

6. Medicare was a "health care benefit program," as defined by Title 18, United States Code, Section 24(b).

7. The Medicare program was divided into different "parts." "Part A" of the Medicare program covered health services provided by hospitals, skilled nursing facilities, hospices, and home health agencies. "Part B" of the Medicare program covered outpatient hospital services and professional services provided by physicians and other providers; it also covered certain drugs provided "incident to" a physician's service and durable medical equipment. "Part C" of the Medicare program, which is also known as Medicare Advantage ("MA"), provided beneficiaries with all of the same services provided by Parts A and B (except hospice care), in addition to mandatory supplemental benefits and optional supplemental benefits.

8. Part C beneficiaries enrolled in a managed care plan, choosing among health maintenance organizations, provider sponsored organizations, preferred provider organizations, and Special Needs Plans ("SNPs"). In regards to the latter plan, SNPs were created by Congress in the Medicare Prescription Drug, Improvement, and Modernization Act of 2003 ("MMA") (Pub L. 108-173, enacted Dec. 8, 2004). Pursuant to the MMA, CMS authorized SNPs to target three specific types of beneficiaries for enrollment: institutionalized beneficiaries; beneficiaries who are eligible for both Medicare and Medicaid ("dual eligibles"); and beneficiaries with severe or disabling chronic conditions, such as AIDS, HIV, diabetes, and

end stage renal disease.

**Universal American Corporation**

9. A number of entities contracted with CMS to provide managed care to Part C beneficiaries through the various approved plans. In the Southern District of Florida, Universal American Corporation ("Universal") was one such entity. Universal provided Medicare Part C insurance plans to beneficiaries in the Southern District of Florida through two business units, Pyramid Life Insurance Company ("Pyramid") and Marquette National Life Insurance Company ("Marquette").

10. Pyramid and Marquette administered Medicare Advantage with Prescription Drugs ("MAPD"), which were created by Congress in the Medicare Prescription Drug, Improvement, and Modernization Act of 2003 ("MMA") (Pub L. 108-173, enacted Dec. 8, 2004).

11. Dual eligibles could enroll in Part C at any time and de-enroll (switch plans to another Part C plan) at any time.

12. Beneficiaries wishing to enroll in Part C through Pyramid and Marquette could do so through a number of means, including via Universal and CMS websites.

**Billing Procedures for Universal**

13. Payments under the Medicare program were often made directly to a physician or provider of the goods or services rather than to the beneficiary. This occurred when the provider accepted assignment of the right to payment from the beneficiary. In that case, the provider submitted the claim to Medicare for payment, either directly or through a billing company.

14. To obtain payment for treatment or services provided to a beneficiary enrolled in one of

Universal's Part C plans, health care providers had to submit itemized claims forms to Universal. The claim forms could be submitted via electronic data interchange ("EDI") through a third party claims clearinghouse, such as Emdeon, via fax, or through U.S. mail.

15. Universal received EDI from Emdeon using the HIPAA compliant 837 file data format, modeled after CMS's Form 1500, the standard Medicare claims form that also was used by non-Governmental health benefit programs. The information in the 837 file, which included, among other things, the beneficiary's name, the services allegedly rendered, and the identity of the treating physician, was the basis for payment to the provider.

16. When a claim was submitted electronically, the submitting party certified that the contents of the form were true, correct, complete, and that the form was prepared in compliance with the laws and regulations governing the Medicare program. The submitting party also certified that the services being billed were medically necessary and were in fact provided as billed. When a claim was submitted via U.S. mail, the documents were sent to Emdeon via express mail and were scanned via optical character recognition into the EDI 837 format. When a claim was submitted via fax, the claim data was entered in Universal's claims administration system for processing.

17. Rather than reimbursing for each individual claim submitted by providers to Universal for medical claims, as in other parts of Medicare, CMS provided fixed, monthly payments for each enrolled Part C beneficiary enrolled in a Universal MA or MAPD plan, which were referred to as "capitation" payments. Thus, every month CMS paid Universal a pre-determined amount for each beneficiary who was enrolled in one of its Part C plans, regardless of whether or not the beneficiary utilized the plan's services that month. CMS

determined the per-patient capitation amount using actuarial tables, based on a variety of factors; the rate was first set by the beneficiary's county of residence, and then adjusted for over 70 factors, such as age, sex, severity of illness, etc. CMS adjusted the capitation rates annually, taking into account each patient's previous illness diagnoses and treatments. Beneficiaries with more illnesses or more serious conditions would rate at a higher capitation payment than healthier beneficiaries.

18. On a regular basis, Universal - and all Part C plans - submitted to CMS certain information and data regarding its enrolled beneficiaries, including the diagnosis code for any claims paid by Universal for that beneficiary. CMS used this data to determine the capitation rates for each patient for the following plan year. Thus, claims submitted in one plan year would increase the amount of capitation payments for those beneficiaries in subsequent plan years, and a substantial number of false claims could dramatically increase the capitation payments.

**R&M Services Center Corp.**

19. R&M Services Center Corp. ("R&M"), a purported supplier of HIV related infusion medications located at 13903 N.W. 67th Avenue, Suite 250, Miami Lakes, Florida 33014, was incorporated in the State of Florida on June 17, 2008. State records indicate that at the time of incorporation, SPIEGEL was listed as President, and Mildred Morales ("Morales") as Secretary, Registered Agent, and sole Incorporator.

20. On June 26, 2008, SPIEGEL and Morales opened a corporate bank account on behalf of R&M at Dade County Federal Credit Union: account number 187915. Bank records indicate that at the time the account was opened, SPIEGEL listed himself as President of R&M and both individuals were referenced as authorized signers (the only) on the account.

21. Thereafter, between September 3, 2008, and December 31, 2008, R&M submitted approximately $952,589 in claims to Universal based on various medications it purportedly prescribed for and/or provided to Part C beneficiaries. Based upon these claims, Universal paid R&M approximately $425,385.

22. A later analysis of R&M's billing records revealed that the only referring physician for R&M was SPIEGEL, who, according to his own previous statement to law enforcement, as well records he submitted to the State of Florida and Universal, is a retired obstetrician gynecologist.

**Fraud committed by SPIEGEL**

23. Universal performed an analysis of R&M's claims data, as well as an analysis of the data of other clinics believed to be committing similar Part C fraud in Miami-Dade County. As part of their analysis, Universal identified six Medicare beneficiaries who received abnormally large amounts of medications/medical services from the suspected fraudulent clinics. Upon review, Universal's medical director, Dr. Michael Davidson, concluded that the medications purportedly being administered were not only medically unnecessary, but entirely improbable (in terms of both frequency and dosage).

24. On August 21, 2009, your Affiant interviewed Morales, who admitted, in part, that she, SPIEGEL, and others conspired to defraud Medicare through their ownership and operation of R&M. Specifically, she, SPIEGEL, and others paid Medicare beneficiaries to come to R&M so that R&M could thereafter submit claims to Universal on their behalf. She further admitted that the they utilized numerous "check cashers" to subsequently launder the ill-gotten funds. She also stated: ① she believed patients were receiving legitimate medications; ② SPIEGEL never visited with, or administered medications to, patients; ③ SPIEGEL was present at R+M once a week to sign documentation already completed by the clinic's physician assistant; and ④ in return for their efforts, "check cashers" were paid by retaining 10% of the funds they obtained.

6

25. Based on the foregoing facts, your Affiant believes there is probable cause that from on or about June 17, 2008, and continuing through on or about December 31, 2008, in Miami-Dade County, in the Southern District of Florida, and elsewhere, SPIEGEL did knowingly and willfully combine, conspire, confederate and agree with others to violate Title 18, United States Code, Section 1347, that is, to execute a scheme and artifice to defraud a health care benefit program affecting commerce, as defined in Title 18, United States Code, Section 24(b), that is, Medicare, and to obtain, by means of materially false and fraudulent pretenses, representations, and promises, money and property owned by, and under the custody and control of, said health care benefit program, in connection with the delivery of and payment for any health care benefits, items, and services; in violation of Title 18, United States Code, Section 1349.

FURTHER AFFIANT SAYETH NAUGHT.

_____
SCOTT HOUSER, SPECIAL AGENT
FEDERAL BUREAU OF INVESTIGATION

Sworn to and subscribed before me
this 21st day of August, 2009.

_____
ANDREA M. SIMONTON
UNITED STATES MAGISTRATE JUDGE

7